**EXPANDING ENERGY, INC., et al., Plaintiffs,**

**v.**

**KOCH INDUSTRIES, INC., et al., Defendants.**

**SIEVERLING INVESTMENT COMPANY, INC., Plaintiff,**

**v.**

**KOCH INDUSTRIES, INC., et al., Defendants.**

**Civ. A. Nos. H–89–3958, H–90–92.**

United States District Court, S.D. Texas, Houston Division.

June 29, 1990.

Kenton C. Granger, Niewald & Waldeck, Robert B. Raymond, P. John Brady, Kansas City, Mo., for plaintiffs.

Thomas B. Alleman, Local Co–Counsel, Niewald, Waldeck, Norris & Brown, Houston, Tex., for Sieverling Inv. Co., Inc.

William E. Matthews, William B. Allison, Sewell & Riggs, Houston, Tex., and Robert L. Howard, James M. Armstrong, Foulston & Siefkin, Wichita, Kan., for defendants.

---

## MEMORANDUM AND ORDER:

### NORMAN W. BLACK, District Judge.

Plaintiffs are four sellers of crude oil which have brought a RICO action against Koch Industries, Inc. ("Koch") seeking to have a class certified pursuant to Rule 23 of the Federal Rules of Civil Procedure. All parties have completed extensive and exhaustive discovery; have submitted thorough briefs and have agreed that the Court may consider all depositions, affidavits and exhibits regardless of which party submitted such material. The Court permitted a total of some five hours of oral argument and has reviewed all of the material submitted.

Plaintiffs' proposed class is:

All persons or entities (including but not limited to, individuals, proprietorships, partnerships, corporations, other business entities and governmental entities located in the United States, but excluding all Defendants and subsidiaries of Koch Industries, Inc.) as oil producers, as holders of working interests, as overriding royalty interest owners, as royalty owners or under any other claim of right or interest in crude oil (including Indian allottees) who at any time during the period from January 1, 1971 through at least November 16, 1989, sold or held a claim to revenues from the sale of crude oil from storage tanks at the well site, where no LACT measurement system was used, to Koch Industries, Inc. (including any subsidiary of Koch Industries, Inc. at the time of such sale).

To paraphrase, Plaintiffs want a class consisting of any entity which had a beneficial interest in receiving an accurate measure of the crude oil sold to Koch during the time stated where the oil was measured by Koch's employees by hand rather than by meter.

The theory of Plaintiffs' case is that Koch had a company-wide scheme to train its oil gaugers systematically to cheat Plaintiffs and other similarly-situated sellers of crude oil. The cheating, to state it simply, allegedly consists of deliberately mismeasuring the crude purchased so that Koch paid for less oil than it actually received. Plaintiffs assert, at this preliminary, class-certification stage, that they will be able to offer generalized evidence to show an impact on the class. The proffer consists of anecdotal evidence from certain former Koch gaugers that they were instructed deliberately to juggle their measurements in Koch's favor and that Koch's own internal and external reports of their inventory overages and shortages show a pattern which can be explained only as evidence of systematic cheating.

Counsel are in substantial agreement about the elements of Rule 23 and the burden placed on movant. They have concentrated their argument and disagreements on whether facts common to the putative class predominate over facts affecting only individual oil sellers; whether a class action would be manageable and whether a class action would better serve the interests of the class. In order to address these issues, the Court finds the following:

1. During the period of time in question, Defendant Koch purchased as much as 530,000 barrels of crude oil per day with as many as 500 individual gaugers taking the readings at the well sites. Koch issues as many as 620,000 checks to approximately 115,000 interest owners in one year.

2. Approximately 100,000 barrels of crude per day are purchased by Koch other than at the well head.

3. Approximately 45% of the oil purchased is metered as it moves into a pipeline; therefore, hand-metering by Koch gaugers is eliminated.

4. Koch purchases crude oil from interest owners in a number of states, and the types of oil and its relative purity and value are very different.

5. Plaintiffs have been customers of Koch in the past, and Koch has also purchased crude from many of the major oil companies of the world.

6. Each oil lease from which Koch purchases oil generally has a number of interest owners. Some own working interests and some own royalty interests. Every

month, Koch adds approximately 270 leases to its routes and deletes some 100. Over the period from 1971 to date, there would be as many as a million interest owners to whom Koch has made some payment for oil purchases.

7. During the period 1971 to date, the price of crude oil varied substantially and, during periods of extraordinarily high prices, producers put severe pressure on Koch to pick up, measure and pay for their oil.

8. Oil which is not placed directly into a metered pipeline is picked up by Koch personnel in tank trucks. This is the oil which Plaintiffs believe is being deliberately mismeasured to their detriment and to the detriment of the class. This oil will be referred to hereafter as "hand-measured" oil.

9. Since crude oil is priced as a "standardized" product and since crude oil as it comes out of the ground is very different depending on the source, there is a generally-accepted method of gauging the hand-measured oil at the point it is purchased by Koch. The American Petroleum Institute ("API") has standards, and those standards are well known to the purchasers and sellers of crude oil. In simple language, a Koch gauger or seller's pumper should do the following to obtain the information needed to determine the amount of oil in a tank: measure the depth of the oil with a steel gauge line; measure the temperature of the oil with a special thermometer; measure basic sediment and water (bs & w) in a centrifuge; measure the specific gravity with a hydrometer; determine whether there is an excess of sediment in the bottom of the tank and, finally, measure the oil remaining in the tank. Each of these measurements is recorded on a "run ticket" a copy of which is left with the producer. The data from each run ticket is sent to Koch in Wichita, Kansas where it is run through a computer which converts the various measurements into a standard unit for payment purposes.

10. There are a number of common factors which substantially affect whether even the most honest and skillful gauger can get reasonably accurate readings of the six measurements referred to above. The oil in the tank might be "green". That is to say that it recently came out of the well and is contaminated with gas. The temperature taken may be inaccurate because taken too close to the side of the tank. The tank might not be of a standard size or shape and therefore impossible to "strap" accurately. Any of the gauger's instruments may be broken or out of adjustment.

11. Even a slight error in any of the measurements made by the gauger can affect the computer's calculation of how much oil to pay for, and both Koch and its customers should be interested in as much accuracy as possible. The customers want to be paid for the oil they sell, and Koch must compete in the oil field with others in the same line of work.

12. Koch and its competitors maintain records of what is known as "overages/shortages." These records enable Koch to add to its known inventory any purchases which the computer shows for the month. By deducting what is shown by the computer as sales for the month along with the closing inventory, the company knows whether it is over or short for that month. The states of New Mexico, Texas and Louisiana all require the publishing of those figures, so that overages may be taxed. The vast majority of companies reports overages regularly, and those overages range up to 3.6%. Koch's overages run at about .25%.

13. Koch has approximately 250 separate points at which it places the oil it has picked up in trucks into pipelines. Each of those points maintains (or has maintained for it) overage/shortage records. Oil from leases near the points is generally trucked to those nearby points, but there is no consistency. Oil from one lease may go to a particular point one month and to another the next month. There is no consistent overage or shortage at the delivery points. Some are over one month and short the next.

14. Some of Koch's customers measure their tanks before the Koch people arrive

and some measure their tanks after Koch ("backgauging"). Some customers have their pumpers standing by while the Koch gaugers are taking their measurements. In certain instances, Koch has been criticized by its customers for mismeasurements and has made settlements of disputed numbers.

15. Plaintiffs have testimony from certain former employees of Koch to the effect that they were "trained" as Koch gaugers to employ the so-called Koch method, that is, to cheat in their measurements to assure Koch an overage. Such testimony, if believed by the finder of fact, would be very damaging to Koch. When considering that testimony during the class-certification inquiry, however, that testimony creates problems. While these exgaugers claim that they were trained to cheat, each denies doing so. Each claims to be, in effect, the only honest gauger in Koch's employ.

### Conclusion

"The unique facts of each case will generally be the determining factor governing certification." *State of Ala. v. Blue Bird Body Co., Inc.,* 573 F.2d 309 (5th Cir.1978). The unique facts set out as numbered paragraphs 1. through 15., above, lead inevitably to the conclusion that Plaintiffs' Amended Motion for Class Certification must be denied for the following reasons:

Plaintiffs' RICO case sounds in fraud, and, to paraphrase the words of the Advisory Committee Note to Fed.R.Civ.P. 23, significant issues of liability will be present which would affect the individual class members in different ways. Liability will be affected by the period of time involved; the kind of crude being produced; the type of storage tank on the lease; the amount of supervision performed by representatives of the producer; whether the Koch station to which the oil was delivered had an overage or shortage and whether or not Koch and its customer agreed to waive the API standards and operate on estimates only.

Common questions of fact simply do not predominate over individual fact situations.

The proposed class action would be unmanageable because of the tremendous differences among leases, and the procedure followed in hand-measuring the oil from those leases. It was common for leases to be hand-measured by Koch gaugers alone, then for the same lease to be hand-measured by seller's employees along with the Koch gaugers, then for the very same lease to be estimated rather than measured at all. Each of the run tickets would have to be analyzed to give a meaningful result.

It is beyond argument that Koch suffered shortages from time to time as well as overages, and that some of the interest owners received consistent, honest measurements. The impropriety of a class action in these circumstances seems to be obvious, since the class cannot show class-wide injury. Perhaps some of the members of the proposed class can show injury for at least some of their sales to Koch, but that fact argues against certifying a class at all.

While most of the Fifth Circuit law on commonality has been developed in antitrust case law, the principles are common to fraud cases as well. Liability as to each member of the class cannot be established in this fact context by generalized, class-wide proof. The device of the class action cannot be permitted to relieve Plaintiffs of their burden of proving in this RICO action that the class was injured in its business or property. In other words, Plaintiffs must carry their burden of proving impact on the class members, and this they have not done. Common questions simply do not predominate.

Plaintiffs have not established that this is a case where generalized proof can be offered to show injury to the class as a class, and that the damages of each individual class member can be left to be determined by a special master or some such device.

Despite volumes of depositions, numberless affidavits and extensive and thorough briefing, Plaintiffs have failed to satisfy the Court that common questions of fact predominate; that there is generalized proof of injury to the class; that each

member of the proposed class was affected by Defendant's alleged conduct and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy. This case will not proceed as a class action.