UNITED STATES of America ex rel.
William I. KOCH and William
A. Presley, Plaintiffs,

v.

KOCH INDUSTRIES, INC.,
et al., Defendants.

No. 91–CV–763–K(J).

United States District Court,
N.D. Oklahoma.

Aug. 6, 1998.

Phil Pinnell, United States Attorney, Tulsa, OK, Stephen D. Altman, Gordon Jones, U.S. Department of Justice, Commercial Litigation, Civil Division, Washington, DC, James M. Sturdivant, David Edward Keglovits, Kristin L. Oliver, Gable & Gotwals, Tulsa, OK, Roy Morrow Bell, Timothy P. Irving, James W. Stubblefield, Ross, Dixon & Bell LLP, San Diego, CA, for plaintiffs.

Harvey D. Ellis, Jr., Clyde A. Muchmore, Timila S. Rother, Mark S. Grossman, Wesley C. Fredenburg, Crowe & Dunlevy, Oklahoma City, OK, Robert L. Howard, James M. Armstrong, Foulston & Siefkin, David Luce, Legal Dept., Litigation Section, Wichita, KS, for defendants.

## ORDER

JOYNER, United States Magistrate Judge.

Now before the Court is Plaintiffs' motion for sanctions due to Defendants' alleged destruction of relevant evidence. [Doc. No. 153]. The Court held a hearing and received evidence and heard testimony on Plaintiffs' motion from May 12, 1997 to May 16, 1997. The Court also received additional evidence after the hearing. *See* March 30, 1998 Order, Doc. No. 258, and July 7, 1998 Order, Doc. No. 315. The Court has reviewed only the evidence submitted at the hearing and the evidence admitted by order after the hearing. Based on its review of this evi-

dence, the Court hereby enters the attached findings and conclusions.

TABLE OF CONTENTS

*FINDINGS* .................................................. 465

A. KII'S DUTY TO PRESERVE INFORMATION AND
   ACTIONS TAKEN BY KII TO PRESERVE INFORMATION.................. 465

B. NORTHERN DIVISION DOCUMENTS ..................................... 471

    Over/Short Documents ......................................... 471

    Driver/Gauger Evaluations ..................................... 472

C. COMPUTER TAPES ................................................. 472

    General Background ........................................... 472

    TLS–100's and TLS–900's ...................................... 473

    Retention Periods ............................................ 474

    Existence and Destruction of Computer Tapes .................... 475

D. RUN TICKETS ................................................... 479

E. TEXAS, OKLAHOMA AND NEW MEXICO DOCUMENTS .................... 479

F. MISCELLANEOUS ................................................. 480

*CONCLUSIONS* .................................................. 482

### FINDINGS

#### A. KII'S DUTY TO PRESERVE INFORMATION AND ACTIONS TAKEN BY KII TO PRESERVE INFORMATION

1. Donald L. Cordes is a lawyer. Mr. Cordes joined Koch Industries, Inc. ("KII") in September 1980. KII is the parent corporation over all of the corporations that are defendants in this case. The Court's use of KII is intended to refer to all named defendants, unless otherwise specified.

a. From 1983 to 1993, Mr. Cordes was KII's Executive Vice President of Legal and Corporate Affairs and from 1983 to 1993, KII's Legal Department, Tax Department, Security Department, Public Affairs Department and Governmental Affairs Department reported to Mr. Cordes.

b. From 1993 to February 1996, Mr. Cordes was KII's Executive Vice President and Chief Legal Officer.

c. Mr. Cordes became a KII director in February 1996 and from February 1996 to the present, Mr. Cordes has served as KII's Executive Vice President and Special Counsel.

d. Mr. Cordes owns a significant number of shares in KII and is highly compensated by KII for his services.

e. At all relevant times, Mr. Cordes was KII's senior lawyer, overseeing the *Martin Oil Service, Inc. v. Koch Refining Co.* litigation; the *Oxbow Energy, Inc. v. Koch Industries, Inc.*, 686 F.Supp. 278 (D.Kan.1988) litigation; the Senate Investigation; the *Expanding Energy, Inc. v. Koch Industries, Inc.*, 132 F.R.D. 180 (S.D.Tex.1990) litigation; the *United States of America ex rel. The Precision Co. v. Koch Industries, Inc.*, No. 89–C–437–C, 1990 WL 422422 (N.D.Okla.1990) (*Precision I*) litigation; and the litigation in this case.

f. At all relevant times, Mr. Cordes was responsible for preserving evidence relevant to allegations of KII's mismeasurement of crude oil.

g. At all relevant times, Mr. Cordes reported directly to the CEO of KII, Charles Koch.

2. KII has not developed or implemented formal, company-wide information retention policies relating to the preservation of information for pending litigation or for other reasons. There is no evidence that KII's senior management has developed any specific information retention policies that express a clear and unequivocal document retention policy capable of easy reference by KII's employees.

a. KII has no formal information retention policies despite the fact that they have over 350 lawsuits pending at any given time.

b. Mr. Cordes testified that in his opinion, formal policies were not needed because in his experience KII generally kept documents for a long period of time—six to 10 years or longer. Mr. Cordes also testified that he thought that a policy covering all of the KII companies would be unworkable due to the diverse nature of the business conducted by the companies and because of their diverse geographic locations. In fact, Mr. Cordes never discussed the need for a document retention policy with KII CEO, Charles Koch.

3. Congressman Tom Daschle, having received complaints from his constituents, sent a letter to KII on July 3, 1986 seeking information about how KII determined and verified the volume of oil and gas purchased by KII from a particular lease. KII responded to the Congressman's letter with a letter and nothing more came of Congressman Daschle's letter. See Plaintiffs' Exhibit 21.

4. In early June 1986, Mr. Cordes learned from Paul Siu that Plaintiff, William I. Koch, was alleging that KII was engaged in a management-directed, company-wide scheme to steal oil and that William I. Koch was trying to get the federal government to investigate KII's measurement practices.

a. In September or October of 1986, Mr. Cordes personally heard William I. Koch make the same allegations under oath when Mr. Koch gave a deposition in the *Martin Oil* case. After hearing William I. Koch's testimony in September or October 1986, Mr. Cordes began to understand that William Koch was serious.

b. KII was, therefore, aware, no later than November 1986, of allegations by William I. Koch that KII was stealing oil on a company-wide basis. See Pretrial Stipulation ¶ 4.

c. The allegations made by William I. Koch in the *Martin Oil* case came to fruition in February 1988 when the complaint in the *Oxbow* case was amended to add a RICO claim in Counts XVII and XVIII. The RICO claim accused KII of substantially the same type of wrongful conduct that is alleged in this case. See Plaintiffs' Exhibit 28. The RICO claim was dismissed in May 1988.

d. KII made no company-wide effort to gather information in connection with the allegations made by William I. Koch in the *Martin Oil* case or in connection with the RICO claim asserted in the *Oxbow* case.

5. In October 1987, KII promulgated Standards of Corporate Conduct ("the Standards"). The Standards were generally distributed within the defendant companies. See Defendants' Exhibit B.

a. The Standards define as confidential and proprietary information "[a]ll financial data, business records, technology and information on corporate strategy, objectives, or on modeling and other analytical and/or management techniques ...." *Id.*

b. The Standards prohibit employees from using confidential information for any purpose unrelated to KII's business. The Standards also prohibit employees from giving confidential information to anyone without advance written permission by an officer of KII.

c. The Standards also declare that "[n]o employee shall endeavor to defraud any person in any manner including, but not

limited to, making of false entries in the books and records of Koch, destruction of documents, falsification of documents, giving or soliciting false testimony, or engaging in any act designed to cover up, obscure, or conceal a fraudulent transaction or fact." *Id.*

d. William Hanna, President of KII, sent a memo on July 11, 1988 which was widely distributed through the defendant companies. *See* Plaintiffs' Exhibit 29. In his memo, Mr. Hanna referenced the Standards and the responsibilities the Standards placed on employees in connection with confidential information. Mr. Hanna then directed that "[w]ritten materials which would be useful to our competitors should be destroyed by shredding, burning or some other equally effective method." *Id.*

i. Mr. Cordes testified that even though there was litigation pending at the time Mr. Hanna's July 1988 memo was distributed, he took no steps to countermand Mr. Hanna's memo because he felt none were necessary.

ii. The apparent, but unstated, presumption behind Mr. Hanna's memorandum is that an employee already intends to discard documents. Mr. Hanna's memo simply describes how an employee should discard confidential material (i.e., by destroying it). *See Koch v. Koch Industries, Inc.*, No. 85–1636–SAC, 1997 WL 447822, at *4 (D.Kan. May 2, 1997) (for an opinion by Judge Sam Crow in which he reaches the same conclusion regarding Mr. Hanna's memo).

6. In May 1988, the Select Committee on Indian Affairs of the Senate of the United States began investigating KII's crude oil practices on Indian lands.

7. In October 1988 KII was served with a Subpoena from the Select Committee on Indian Affairs of the Senate of the United States. *See* Plaintiffs' Exhibit 32.

a. Before receiving the Subpoena, Mr. Cordes had heard a "cocktail" rumor in late September 1988 or early October 1988 that William I. Koch was trying to get the Senate interested in investigating KII for oil and gas mismeasurement. Mr. Cordes testified that he never repeated this rumor to anyone.

b. Mr. Cordes was aware that the Senate was specifically seeking data processing and computer-related materials and over/short information for Indian leases. *See* Plaintiffs' Exhibits 43 and 44.

c. After receiving the Subpoena, Mr. Cordes talked with "the Accounting people," Don Chism and Milton Hall, about preserving evidence. Mr. Hall was Controller and Vice President of KII. Mr. Cordes did not, however, send any written instructions to anyone instructing that information relevant to the Subpoena be preserved.

d. Mr. Cordes sent a memo on November 16, 1988 as part of KII's ongoing effort to comply with the Senate Subpoena. Mr. Cordes directed the division managers and field superintendents of the defendant companies to make a list of all files containing instructions to gaugers on gauging methods, reports on gauging procedures, over/short reports, and third party complaints about gauging methods. *See* Plaintiffs' Exhibit 36.

i. Mr. Cordes directed the division managers and field superintendents not to arrange, rearrange, reorganize, purge or destroy files. The files were to be reviewed on an "as is, where is" basis.

ii. Mr. Cordes' memo was directed to field personnel only and was not intended to cover KII's data processing center or accounting departments.

iii. Beginning November 21, 1988, the files identified by the division managers and field superintendents were to be reviewed by Allan Caldwell, KII General Counsel; and David Nicastro, head of KII security.

iv. Mr. Caldwell's and Mr. Nicastro's search focused on documents located at the division offices and the search lasted approximately one week. Mr. Caldwell and Mr. Nicastro retrieved the original documents, took them to Wichita, made copies and returned the

originals to the field. The copies were bates-stamped and stored in a locked room in the KII legal department in Wichita, Kansas. No inventory of the documents or files actually retrieved by Mr. Caldwell and Mr. Nicastro was ever created.

v. Mr. Cordes' November 16, 1988 memo was prompted in part by a report he had received from Mark Wilson, a South Texas field employee, who had been asked by his superior, Leroy Goad, to destroy all of his driver/gauger evaluations. Mr. Cordes interceded and told Mr. Goad to countermand his order to Mr. Wilson if it in fact had been made. KII's security people in the field met with Mr. Wilson and told him not to destroy his driver/gauger evaluations and they were not destroyed. This was the first time Mr. Cordes had ever heard that destruction of documents might be occurring in the field.

vi. Mr. Cordes' November 16, 1998 memo was sent to the Northern Division where Jerald Burks was the division manager and where Wayne Ramburg worked.

vii. The November 16, 1988 memo is the first directive ever sent to the field by Mr. Cordes regarding the preservation of information relating to KII's crude-oil business.

8. In May 1989, the Senate's Select Committee on Indian Affairs held hearings regarding KII's crude oil purchasing practices on Indian lands.

9. By June 1989 KII was aware that the Senate had referred allegations of KII's alleged fraud and oil theft to the Department of Justice for possible prosecution. The United States Attorney for the Western District of Oklahoma subsequently empaneled a grand jury to investigate KII.

10. In August 1989, Mr. Cordes sent Fritz Hansen into the field to gather any and all files and documents that might have a bearing on measurement of crude oil. *See* Plaintiffs' Exhibit 48.

a. Mr. Hansen was KII's retired General Counsel. Mr. Cordes brought Mr. Hansen out of retirement to perform this document collection.

b. Mr. Cordes recognized that there were probably not files neatly labeled "measurement." Consequently, Mr. Cordes encouraged everyone to use their "imagination" to think of places to look, people to ask and things to ask for.

c. Mr. Hansen's search focused on documents located at all of the field offices and it lasted from August 1989 to March 1990.

d. Mr. Hansen retrieved the original documents, took them to Wichita, made copies and returned the originals to the field. The copies were bates-stamped and stored in a locked room in the KII legal department in Wichita, Kansas. No inventory of the documents or files actually retrieved by Mr. Hansen was ever created.

e. Mr. Hansen's search was prompted by KII's anticipation that it would have to produce documents in connection with the grand jury investigation in the Western District of Oklahoma.

11. In November 1989, the *Expanding Energy* case was filed as a class action by producers nationwide, including those on federal and Indian lands. The producers alleged that they had been cheated by KII's crude oil measurement practices.

a. On November 22, 1989, Plaintiffs in the *Expanding Energy* case served a request for production of documents on KII. *See* Plaintiffs' Exhibit 53. That request sought "[a]ll documents or computer data relating to crude oil purchases by Koch from plaintiffs or any class member including payments by Koch therefor." *Id.* at ¶ 14. Paragraph C of the request defined "document" and "computer data" to include "computer printouts, computer memory disks, computer memory tapes, computer internal memory storage . . . data sheets, data processing cards, tapes, logs, tables, [and] displays . . . ." The request was broad enough to cover KII's entire oil purchasing business, not just the purchase of federal or Indian oil.

b. On December 19, 1989, the judge in the *Expanding Energy* lawsuit issued an *ex parte* "Document and Computer Data Preservation Order." *See* Plaintiffs' Exhibit 54. The Order ordered that "pending final disposition of this action and further order of this Court, [KII] shall preserve and shall not intentionally destroy any documents or computer data as those terms are defined in the motion . . . ." *Id.* KII did not receive a copy of the order until two to three weeks after it was entered.

i. Sometime in early 1990, Mr. Cordes sent a copy of the *Expanding Energy* preservation order to Milton Bradley Hall, KII's Controller and Vice President; Lynn Markel, KII's Chief Financial Officer; Don Chism, Koch Oil Company's Controller; and Mary Lou Myers, an accountant. *See* Plaintiffs' Exhibit 55. These individuals were responsible for financial reporting and the computer and data processing departments. Mr. Cordes did not send a copy of the preservation order to field personnel because he believed that the order made reference to 13 specific classes of information which were primarily maintained in KII's Wichita, Kansas headquarters.

ii. On February 6, 1990, Bill Caffey, Senior Vice President of KII, sent a memo to all Division Managers and Area Superintendents telling them that litigation regarding KII's over/short position was pending. Mr. Caffey was in charge of the pipeline group. The memo stated that "it is important that we retain *all* files, both *past and present*, which might pertain to the subject. Therefore, please take steps to make certain that none such files are destroyed or removed from your offices. This would include but not be limited to run tickets, inter-company memos, producer correspondence, etc. Please pass this information to those people in your organization who would maintain or have access to any such files." *See* Plaintiffs' Exhibit 60 (emphasis original).

iii. On February 8, 1990, Gary Baker sent a memo to all Division Managers and District Superintendents telling them that litigation regarding KII's over/short position was pending. Mr. Baker was in charge of the trucking group. The memo stated that "[i]t is important that we retain all of our files which might pertain to this subject. Therefore, please take steps to make certain that none of such files are destroyed or removed from your office. Also, please pass this on to those people in your organization who would maintain or have access to such files." *See* Plaintiffs' Exhibit 61.

iv. The Caffey and Baker memos together would have reached the supervisors of all of KII's guagers.

12. On March 5, 1990, KII was served with the Complaint in *Precision I,* and on March 9, 1990, KII was served with a request for documents in *Precision I. See* Pretrial Stipulation ¶ 8 and Plaintiffs' Exhibit 63. Requests 4 and 8 specifically sought all documents relating to KII's over/short position and all documents relating to KII's purchase, sale and transportation of crude oil and natural gas. The definition of "documents" specifically referred to computer disks, computer tapes, and magnetic tapes.

a. KII did not have to respond to this request because discovery in *Precision I* was stayed on May 20, 1990 and the case was dismissed in December 1990. Dismissal was affirmed on appeal by the Tenth Circuit in July 1992 and Plaintiffs' petition for rehearing was denied in August 1992.

13. In May 1990, a class certification hearing was held in the *Expanding Energy* case. Mr. Cordes was present at the hearing. At the hearing, counsel for the plaintiffs told the court that KII had a "tremendous database" that would be helpful in calculating damages and identifying class members. The *Expanding Energy* case was dismissed in September 1990.

14. This lawsuit was filed in September 1991 and the allegations in this lawsuit are substantially similar to those in the *Precision I* lawsuit served on KII in March 1990.

a. The complaint in this case was amended in August 1992 as a result of the Tenth Circuit's July 1992 order in *Precision I.* Precision Company was dropped as the *qui tam* plaintiff and William I. Koch and William A. Presley were added as *qui tam* plaintiffs. The amended complaint was dismissed in December 1992. The Tenth Circuit reversed the dismissal and remanded the case in August 1994. KII's petition for rehearing was also denied in August 1994.

b. On February 6, 1992, KII was served with a request for documents in this case. *See* Plaintiffs' Exhibit 70. The request was substantially similar to the one served in *Precision I* and it too sought over/short information and information stored on computer disks, computer tapes, and magnetic tapes. KII did not have to respond to this request because discovery was stayed in March 1992 and the case was dismissed in December 1992.

15. On March 30, 1992, KII was notified by the United States Attorney for the Western District of Oklahoma that the grand jury investigation of KII was over and that no indictments were expected. Defendants' Exhibit H.

16. During 1990 and 1994, Sarah Seeley–Sanborn, KII's manager of corporate records, spent three to four years working on a comprehensive document retention policy for the Koch companies. Mrs. Sanborn traveled to several field offices to try and gain an understanding of what documents were being generated and how they were being used and retained. Mrs. Sanborn did draft a proposed, comprehensive document retention plan after her years of research. *See* Exhibit 6 to Mrs. Sanborn's April 23, 1998 deposition. Despite Mrs. Sanborn's efforts, her proposed, comprehensive document retention plan was not implemented. According to Mrs. Sanborn, she and her supervisor, Ray Rys, could not get KII management interested in the idea.

a. While manager of corporate records, Mrs. Sanborn was only informed about one piece of litigation against KII—a DOJ lawsuit. Mrs. Sanborn felt that she was kept out of the loop regarding pending litigation. In Mrs. Sanborn's opinion, her lack of information regarding pending litigation was a major flaw in KII's document retention system. Mrs. Sanborn voiced her opinion on several occasions, almost to the point of being fired, without significant results. Mrs. Sanborn did not receive much of a response from KII's management to her requests to be kept in the loop regarding pending litigation.

17. On October 16, 1994, KII was served with Plaintiffs' first post-remand request for production of documents in this case. *See* Plaintiffs' Exhibit 82. Again, Plaintiffs were seeking over/short information.

a. Plaintiffs' discovery requests defined "documents" to include information stored on computer disks, computer tapes, and magnetic tapes. There were, however, no requests that related specifically to computer tapes or other electronic data.

b. Anticipating this request, KII began in September 1994 to assign people to go out and gather documents.

c. KII responded to Plaintiffs' discovery requests in writing on November 18, 1994. *See* Defendants' Exhibit LL. The responses were further refined through correspondence. *See* Defendants' Exhibits MM and NN.

18. Prior to May 1996, the KII Legal Department never gave any specific instructions regarding information preservation to those working in KII's data processing center or computer tape library.

19. On May 1, 1996, this Court entered an Order in this case ordering that "pending final disposition of this action all parties shall preserve and shall not alter, destroy, or permit the destruction of any documents ... and shall adopt measures to safeguard against destruction of any documents generated from January 1, 1967 through December 31, 1994, that are relevant to the subject matter of this action and which presently remain in existence." *See* Plaintiffs' Exhibit 99.

a. In response to this Order, Larry Purtell, Senior Vice President and General Counsel for KII, sent an email message to all email users directing all addressees to "immediately take appropriate steps to preserve any such information or documents under their control . . .," including computer disks and tapes. *See* Plaintiffs' Exhibit 100.

b. In response to this Order, Mr. Cordes sent a memo on May 9, 1996 to all KII Officers, the Crude Oil Operations and Accounting Groups, the Hydrocarbon Operations and Accounting Groups, the Koch Exploration Operations and Accounting Groups, and the KII Support Groups. *See* Plaintiffs' Exhibit 101. Mr. Cordes intended for the "Data Center people" to get a copy of his memo. The memo details a comprehensive record preservation plan and broadly defines record to "mean any thing upon which [Defendants] put or store data." A copy of this memo was sent by Milton Bradley Hall, Vice President of Information Technology for KII, to Bob Creekmur, Manager of Computing Services. Mr. Creekmur was the manager in charge of the computer data center and computer tape library. *See* Plaintiffs' Exhibit 103.

## B. NORTHERN DIVISION DOCUMENTS

20. KII's Northern Division includes Kansas, Colorado and North Dakota. The Northern Division is managed out of two main offices. One is located in Belfield, North Dakota and one is located in Russell, Kansas. The Russell office is considered the division office. At the time relevant to the allegations in this case, Jerald Burks was the manager of the Northern Division; Bob White was the Chief Gauger for the Northern Division; Charles Meduna was the Assistant Chief Gauger for the Northern Division; and Wayne Ramburg was a gauger in North Dakota.

21. William Presley, one of the Plaintiffs in this action, analyzed the documents produced by KII from the Northern Division. Mr. Presley's analyses are presented and summarized in Plaintiffs' Exhibits 2, 2A, 132 and 133. The Court has thoroughly reviewed William Presley's direct testimony, the cross examination of Mr. Presley, Mr. Presley's analyses, Mr. Cordes' continuous improvement testimony and Defendants' Exhibits JJJ and KKK. Based on this review and on the fact that the burden of proof is on the Plaintiffs, the Court finds Mr. Presley's analysis of the Northern Division documents to be inconclusive. The Court will not, therefore, draw any inferences from Mr. Presley's testimony or analyses.

### Over/Short Documents

22. Over/short reports contain information which is relevant to the subject matter of this litigation.

23. KII has provided Plaintiffs with final over/short reports, over/short detail reports and over/short recap reports from Wichita on all of KII's selling points for 1981 to 1994.

24. As an assistant chief gauger in the Northern Division, Charles Meduna, prepared over/short reports. Mr. Meduna placed these over/short reports in his own files in Belfield, North Dakota and he sent a copy of the reports to the division office in Russell, Kansas. Mr. Meduna testified that his reports were always in his file and they were not thrown away on a regular basis.

25. As chief gauger in the Northern Division, Bob White prepared monthly over/short reports at the Russell, Kansas division office. Mr. White placed these preliminary reports in his own files in Russell and he sent a copy of his reports to Wichita, Kansas. The Wichita office would then prepare final over/short numbers on a monthly basis. Mr. White testified that he kept his over/short reports for three years and then threw them away.

26. On September 26 and 27, 1988, KII held a Continuous Improvement meeting/seminar in Wichita, Kansas. At the seminar, KII was attempting to implement a new management style and new techniques to track KII's over/short position. New measurement and gauging practices/policies were also discussed. A dinner was held at the Airport Hilton on September 26th and the seminar was held in a KII conference room on September 27th. *See* Plaintiffs' Exhibits 30 and 31. Jerald Burks, Wayne Ramburg,

Charles Meduna, and Leroy Goad attended the meetings.

27. On September 27, 1988, Wayne Ramburg attended the Continuous Improvement meeting held in Wichita, Kansas. After the meeting, Mr. Ramburg returned to his hotel, ate dinner and then met in Jerald Burks' hotel room with Jerald Burks, Charles Meduna, Bob White and George Klee. The meeting was casual and impromptu.

a. Mr. Burks was Mr. Ramburg's and Mr. Meduna's boss.

b. Mr. Burks suggested at the impromptu hotel room meeting that everybody get rid of anything that related to the calculation of over/short numbers that was more than two to three months old.

i. After the hotel room meeting, Mr. Ramburg talked briefly with Mr. Meduna about what Mr. Burks said.

ii. Mr. Ramburg assumes that when he and Mr. Meduna returned to their Belfield, North Dakota offices that Mr. Meduna implemented Mr. Burks' suggestion by destroying documents relating to the calculation of over/short numbers. Mr. Ramburg never in fact saw Mr. Meduna destroy any over/short reports.

iii. Mr. Burks, Mr. Meduna and Mr. White all deny that any such suggestion was made.

### Driver/Gauger Evaluations

28. Driver/gauger evaluations contain information which is relevant to the subject matter of this litigation.

29. KII's measurement supervisors, chief gaugers, and assistant chief gaugers, including Charles Meduna and Bob White, prepared periodic driver/gauger evaluations when they rode with a driver or gauger. Mr. Meduna and Mr. White prepared these evaluations for all the years they worked in the Northern Division. See, e.g., Plaintiffs' Exhibit 12. The number of evaluations would fluctuate from year to year, depending on the level of KII's business, the experience of a particular driver/gauger and the rate of driver/gauger turnover.

## C. COMPUTER TAPES
### General Background

30. Run tickets record measurements which, when fed into KII's computer, are used to compute the actual volume and price of oil purchased by KII at a lease. The measurements recorded on a run ticket are obtained by either hand gauging or by meter reading. In both cases, a KII gauger records the measurements on a run ticket. Beginning no later than November 12, 1979, KII inputted certain data from its run tickets into its mainframe computer in Wichita, Kansas. A computer program then used that data and combined it with other formulae and data to compute the net barrels purchased, the price to be paid for those barrels and to generate run statements. KII stored the inputted run ticket data and the data calculated by the computer program in files named AHREGSTATMNT, AHUNITSTMNTS, CT1TICKETS and CRUDEBU. Duplicates of these files were created and these backup files were named AHREGSTATMNTBU, AHUNITSTMNTBKUP, CT1TICKETSBU and CRUDEBUWKLY. The original and backup files were stored on computer tapes in KII's tape library. Pretrial Stipulation ¶¶ 1–3.

a. The following run ticket information was not entered into KII's computer system and stored electronically: the name of the lease, the name of the lease operator, whether the lease was a federal or Indian lease, and whether the gauger was being witnessed.

b. The language of the December 1989 Document and Computer Data Preservation Order issued in Expanding Energy and this Court's May 1, 1996 document preservation order was broad enough to cover all tapes containing AHREGSTATMNT, AHUNITSTMNTS, CT1TICKETS, CRUDEBU, AHREGSTATMNTBU, AHUNITSTMNTBKUP, CT1TICKETSBU and CRUDEBUWKLY files.

31. On October 16, 1994, KII was served with Plaintiffs' first post-remand request for production of documents. See Plaintiffs' Exhibit 82. The request sought information

stored on computer disks, computer tapes, and magnetic tapes. KII responded to the request in writing on November 18, 1994. *See* Defendants' Exhibit LL. The responses were further refined through correspondence. *See* Defendants' Exhibits MM and NN.

a. Plaintiffs' discovery requests were very broad and if responded to fully as written, KII would have been required to produce nearly every document generated in its crude oil business for 15 years. KII's response contained an objection to the breadth of Plaintiffs' requests and indicated what KII was willing to produce. Plaintiffs' counsel and KII's counsel then began negotiating about what other documents KII would be required to produce. Defendants' Exhibits MM and NN. Plaintiffs' follow up inquiries regarding KII's responses never contained any requests for computerized run ticket data. No such request was made by Plaintiffs until after Brad Hall's deposition in April 1996, when Plaintiffs learned that certain computer tapes for 1986 and 1987 were no longer available.

b. As part of its response, KII did produce some computer data. KII produced tank tables and API conversion tables which were kept in an electronic format.

c. When KII responded to Plaintiffs' request for production, Mr. Cordes was not aware that files bearing the names AHREGSTATMNT, AHUNITSTMNTS, CT1TICKETS, CT1TICKETSBU, or CRUDEBUWKLY existed on tape or otherwise. Mr. Cordes admits, however, that had he known about these files, he would have had a duty to preserve them.

d. In responding to Plaintiffs' request for documents, Mr. Cordes enlisted the help of KII's accounting and computer departments. Vance Klager prepared a chart outlining the most efficient way to produce the information requested in Plaintiffs' request for documents. *See* Defendants' Exhibit TT.

   i. The AHREGSTATMNT, AHUN-ITSTMNTS, CT1TICKETS, CT1TICKETSBU, or CRUDEBUWK-LY files were not listed on the chart as

a useful source of information. Mr. Klager did not identify these files because his focus was on the hard copy "documents" that showed a complete picture from the time KII purchases oil at a lease to the filing of an MMS–2014 with the federal government. Mr. Klager's chart does, however, identify tank tables and API tables as being available in an electronic form.

32. Prior to 1990, the computer tapes relevant to this action were maintained in reel-to-reel format. *See* Defendants' Exhibit YY. In July 1990, the reel-to-reel tapes were converted to cartridge-tape format. *See* Defendants' Exhibit ZZ. In April 1995, the cartridge-tapes were converted to DAT-tape format. *See* Defendants' Exhibit AAA.

### TLS–100's and TLS–900's

33. A TLS–900 is a computer-generated report which lists all of the production files used and maintained by KII. Production files are created when a computer program executed by a KII computer operator outputs data to a tape. For each production file used by KII, the TLS–900 shows, among other things, the name of the file, a description of the file, and the retention period for that type of file. *See, e.g.,* Plaintiffs' Exhibit 79. The form attached as the last page of Plaintiffs' Exhibit 11 is the form used by a person wanting to create a new production file and define its retention period. Most production files, and the retention periods associated with the files, were created by KII programmers and systems analysts.

34. A TLS–100 is a computer-generated report which lists all of the computer tapes in KII's tape library (i.e., a tape inventory list). For each tape in the inventory, the TLS–100 shows, among other things, the tape number, the name of the file on the tape, the date the file on the tape was created, the date the tape can be purged/scratched, the physical location of the tape and comments about the tape. Pretrial Stipulation ¶ 15. *See, e.g.,* Plaintiffs' Exhibit 89. A TLS–100 was printed off daily by Lucille Gardner, KII's tape librarian from 1983 to September 1995. The daily TLS–100's were microfiched and retained for one to two years and then they

were destroyed. The TLS–100's for 1990 were retained permanently because the conversion from reel-to-reel to cartridge tapes occurred in 1990 and Ms. Gardner wanted the 1990 TLS–100's as a future reference. KII has been unable to locate the microfiche containing TLS–100's for the years 1991, 1992, and 1993. Pretrial Stipulation ¶ 16.

### Retention Periods

35. Each time KII used a tape to store a file, an entry in the TLS–100 system was created. The file name on the TLS–100 would correspond with one of the files identified on the TLS–900. The purge/scratch date on the TLS–100 would be calculated by the computer as a function of the retention period listed on the TLS–900 for the particular type of file being stored on the tape. The retention period on the TLS–100 could, however, be manually changed. Ms. Gardner was responsible for maintaining the TLS–100 inventory and if she manually changed a retention period for a file on a particular tape, she would have noted the change in the comments field on the TLS–100 for the particular tape. However, Ms. Gardner would not change a retention period without a written request, and she saved and stored all such requests in a three-ring binder on her desk.

36. Retention periods for tapes containing AHREGSTATMNT, AHREG-STATMNTBKUP, AHUNITSTMNTS, and AHUNITSTMNTSBKUP files:

a. Tapes containing AHREGSTATMNT, AHREGSTATMNTBKUP, AHUN-ITSTMNTS, and AHUNITSTMNTSBK-UP files had a general retention period of seven years. Pretrial Stipulation ¶ 9, Defendants' Exhibit J and Plaintiffs' Exhibit 68.

37. Retention period for tapes containing CT1TICKETS and CT1TICKETSBU files:

a. In February 1983, the retention period for tapes containing KII's CT1TICKETS files was one year. Defendants' Exhibit I.

b. On January 2, 1990, the TLS–100 showed the retention period for tapes containing KII's CT1TICKETS and CT1TICKETS-BU files as seven years. Plaintiffs' Ex-

hibit 56. There is no record of a change from a one year to a seven year retention period in Ms. Gardner's three-ring binders.

c. On September 14, 1994, the retention period for tapes containing KII's CT1TICKETS and CT1TICKETSBU files was changed by Don Wiley from seven to 10 years. Pretrial Stipulation ¶ 14, Plaintiffs' Exhibits 75 and 79.

i. This change coincides roughly with the resumption of discovery in this case after remand from the Tenth Circuit. At this time, Don Wiley and Vance Klager were attempting to regenerate various over/short reports by rerunning KII's ACT504 process. Mr. Klager determined that the CT files would be needed to rerun KII's over/short process/reports. So, Mr. Wiley extended the retention period for those tapes containing CT files.

ii. At this point in time, KII had tapes containing CT1TICKETSBU files from 1986 forward.

d. On April 6, 1995, the retention period for tapes containing KII's CT1TICKETS and CT1TICKETSBU files was 10 years. Defendants' Exhibit UU.

e. In May 1996, the retention period for tapes containing KII's CT1TICKETS and CT1TICKETSBU files was changed to permanent retention.

38. Retention period for tapes containing CRUDEBU and CRUDEBUWKLY files:

a. On January 2, 1990, the TLS–100 showed the retention period for tapes containing KII's November and December 1989 CRUDEBUWKLY files as approximately 45 days and the retention period for tapes containing KII's January 1983 to January 1989 year-end CRUDEBUWK-LY files as approximately seven years.

b. On September 14, 1994, the TLS–900 showed the retention period for tapes containing KII's CRUDEBU files as 15 days. Plaintiffs' Exhibit 79.

c. On September 15, 1994, Perry White sent Ms. Gardner a written request directing that the retention period for tapes con-

taining KII's year-end CRUDEBUWK-LY files be extended from seven years to 10 years. Plaintiffs' Exhibit 80. This change coincides roughly with the resumption of discovery in this case after remand from the Tenth Circuit.

d. In December 1994, the tapes containing KII's year-end CRUDEBUWKLY files for January 1986 to January 1988 had been marked for permanent retention and had been moved to KII's disaster recovery center. Plaintiffs' Exhibit 89.

e. On April 24, 1996, the TLS–100 showed a permanent retention period for tapes containing year-end CRUDEBUWKLY files for 1986 to 1988 and a ten year retention period for tapes containing year-end CRUDEBUWKLY files for 1989 to 1994. Defendants' Exhibit AAAA.

39. Allan Davis, KII's Director of Data Processing from 1974 to 1992, never received any instructions to preserve computer data for this case. Bob Creekmur, KII's data processing manager from May 1993 to mid 1996, was never instructed to preserve data relevant to this case until May 1996. KII's computer tape librarian, Lucille Gardner, never received instructions directly from Mr. Cordes or KII's legal department to preserve any computer tapes for this lawsuit.

### Existence and Destruction of Computer Tapes

40. AHREGSTATMNT, AHREG-STATMNTBKUP, AHUNITSTMNTS, and AHUNITSTMNTSBKUP Files (collectively referred to as the AH files):

a. KII began maintaining AH files in 1968 and as early as November 1979, the AH files were being maintained by KII on magnetic tape. KII did not create any tapes containing AH files after August 1983. Pretrial Stipulation ¶ 9.

b. The AH files are transaction files which contain data from individual run tickets. For example, the files contain the top gauge, bottom gauge, bs & w, gravity and lease number from a particular run ticket. Thus, the AH files contained information relevant to the subject matter of this litigation. *See, e.g.,* Plaintiffs' Ex-

hibits 7 and 113 (describing the information stored in the AH files).

c. The data on the tapes containing AH files could be searched and manipulated after writing a computer program for such purpose. Pretrial Stipulation ¶ 18.

d. By 1991, all tapes containing AH files had been routinely scratched pursuant to a seven year retention schedule. By 1991 no tapes containing AH files existed in KII's tape library.

e. Tape Lists (TLS–100's, etc.)

i. Plaintiffs' Exhibit 68—this exhibit is a portion of a TLS–100 showing the tapes containing AHREGSTATMNT, AHREGSTATMNTBKUP, AHUN-ITSTMNTS and AHUN-ITSTMNTSBKUP files in KII's inventory on December 28, 1990. As of December 28, 1990, KII had tapes containing AHREGSTATMNT, AH-REGSTATMNTBKUP, AHUN-ITSTMNTS and AHUN-ITSTMNTSBKUP files for all months of 1983, except March and April. Pretrial Stipulation ¶ 11. This is the last TLS–100 showing the existence of tapes containing AH files in KII's tape library.

ii. Plaintiffs' Exhibit 72—this exhibit is a portion of a TLS–100 showing that as of January 1, 1994, KII no longer had any tapes containing AH-REGSTATMNT, AHREG-STATMNTBKUP, AHUNITSTMNTS or AHUNITSTMNTSBKUP files in its tape library.

41. CT1TICKETS and CT1TICKETSBU Files (collectively referred to as the CT files):

a. The CT files are transaction files which contain some, but not all, of the data recorded on individual run tickets. For example, the files contain the top gauge, bottom gauge, bs & w, gravity and lease number from a particular run ticket. The CT1TICKETSBU file is a backup file for the CT1TICKETS file and both files should contain identical information for a particular month. *See, e.g.,* Plaintiffs' Exhibit 111 (describing the information stored in the CT

files); and Defendants' Exhibit HH (showing the information on a run ticket that is not recorded in the CT files).

b. The CT files maintained by KII on tape contain information relevant to the subject matter of this litigation. Plaintiffs can use the CT files on tape to perform statistical analyses which are relevant to the issues in this lawsuit. *See* Pretrial Stipulation ¶ 18, and Plaintiffs' Exhibits 37–41. It is currently cost and time prohibitive to recreate the missing CT1TICKETS and/or CT1TICKETSBU files, or a subset of these files, by keypunching the data on existing run tickets.

c. Tape Lists (TLS–100's, etc.)

   i. Defendants' Exhibit N—this exhibit is a list of all tapes in KII's tape library containing CT1TICKETS files in August 1987. As of August 1987, KII had CT1TICKETS tapes for December 1985 to August 1987.

   ii. Plaintiffs' Exhibit 56/Defendants' Exhibit II—this exhibit is a portion of a TLS–100 showing the tapes containing CT1TICKETS and CT1TICKETSBU files in KII's inventory on January 2, 1990. As of January 2, 1990, KII had tapes containing CT1TICKETS and CT1TICKETSBU files for December 1985 to December 1989. KII had no tapes containing CT1TICKETS or CT1TICKETSBU files for any month prior to December 1985. Pretrial Stipulation ¶ 10.

   iii. Plaintiffs' Exhibit 78—this exhibit is a portion of a TLS–100 showing the tapes containing CT1TICKETS and CT1TICKETSBU files in KII's inventory on September 14, 1994. As of September 14, 1994, KII had tapes containing CT1TICKETS files for 1987–1994 and CT1TICKETSBU files for 1986–1994.

   iv. Defendants' Exhibit JJ—this exhibit is a portion of a TLS–100 showing the tapes containing CT1TICKETS and CT1TICKETSBU files in KII's inventory on April 3, 1995. As of April 3, 1995, KII had tapes containing CT1TICKETS files for 1988–1995 and CT1TICKETSBU files for 1986–1995.

This exhibit also corresponds with the beginning of KII's conversion from cartridge tape format to DAT tape format.

d. Destruction of tapes containing CT1TICKETS files:

   i. Pre December 1985

      (1) All tapes prior to December 1985 were routinely scratched by KII's tape librarian and no pre December 1985 tapes existed by January 2, 1990.

   ii. December 1985 to April 1988

      (1) In July 1990, KII's reel-to-reel computer tapes were converted to cartridge tapes, including the tapes containing CT1TICKETS files back to December 1985. When the conversion was made, the TLS–100 system automatically recorded the creation date for the new cartridge tapes as the date of the conversion in 1990 and the purge date as being seven years from the creation date. When the tape librarian discovered this, she manually changed the purge date to seven years from the file's original creation date and not seven years from the date of the 1990 conversion. This change was made only to those tapes containing CT1TICKETS files and not to those tapes containing CT1TICKETSBU files.

      (2) Tapes containing CT1TICKETS files for December 1985 to April 1988 were scratched by KII's tape librarian, monthly, between December 1992 and April 1995, pursuant to the retention periods manually set by the tape librarian shortly after the 1990 conversion from reel-to-reel to cartridge tapes. The tapes containing the corresponding CT1TICKETSBU files were not scratched at the same time because their retention periods were all set to 1997 (i.e., seven years from the 1990 conversion) and they were not manually changed by the tape librarian after the 1990 conversion. Pretrial Stipulation ¶ 12.

e. Destruction of tapes containing CT1TICKETSBU files:

i. Pre–1986

(1) All tapes prior to 1986 were routinely scratched by KII's tape librarian and no pre–1986 tapes existed by January 2, 1990.

ii. January 1986 through December 1987

(1) Tapes containing CT1TICKETSBU files for these months disappeared from KII's tape library sometime after the conversion of KII's cartridge tapes to DAT tapes in April 1995. The information in the January 1986 to November 1987 CT1TICKETSBU files was the only existing copy of that information because the tapes containing the original CT1TICKETS files for January 1986 to November 1987 had been scratched by KII in 1993 and 1994. KII's computer department was not given any special instructions by management regarding the handling of the tapes containing the January 1986 to November 1987 CT1TICKETSBU files, even though those files contained the only surviving copy of CT1TICKETS data for January 1986 to November 1987.

(2) In April 1995, KII converted its 13,-000 + cartridge tapes to DAT tapes. With regard to the CT tapes, KII was attempting to place the information from 12 monthly CT cartridge tapes on one DAT tape. During the conversion process, Terri Tate, a KII senior computer operator, had problems converting to DAT tapes the cartridge tapes containing CT1TICKETSBU files for January 1986 to November 1987. Ms. Tate placed the cartridge tapes she was unable to convert on the desk of KII's computer tape librarian, Lucille Gardner, along with some paperwork which would indicate to Ms. Gardner that there had been a problem converting the tapes.

(a) The conversion problem was caused because the record layout for the CT files was changed in May or June of 1987 from 180 bytes to 198 bytes. The post–1986 record layout for the CT files contained one or two more fields than did the pre–1987 record layout for the CT files. KII acquired a company based in Osage County, Oklahoma in December 1986. New fields were added to the CT files to comply with the reporting requirements for the Osage Indian tribe.

(b) There is no evidence that the programmer who wrote the conversion program or that the department who used the CT files was notified about the conversion problem.

(3) As part of the April 1995 conversion, KII was erasing, boxing up and selling the converted cartridge tapes to a third party. Consequently, the tape library and the disaster recovery center was messy during the April 1995 conversion. There were boxes of cartridge tapes stacked along the walls, in the middle of the floor and on desks. Ms. Gardner remembers seeing the 1986–1987 unconverted cartridge tapes Ms. Tate had placed on a desk in Ms. Gardner's office/library, but Ms. Gardner does not know what eventually happened to the tapes—they just disappeared. The converted cartridge tapes were sold by KII in August 1995.

(4) These 1986–1987 tapes were removed from the tape inventory system (i.e., the TLS–100) between June 19 and June 20, 1995. Pretrial Stipulation ¶ 13, Defendants' Exhibit KK.

(5) The Court has fully considered the testimony of Ron Howard regarding the probabilities at work in this case. Despite this testimony, the Court is not convinced that the loss or destruction of the 1986–1987 tapes occurred other than by accident.

iii. January 1988 to July 1997—these tapes are still in existence and KII

478

has produced the tapes for 1988 to 1994 to Plaintiffs.

42. CRUDEBU and CRUDEBUWKLY Files (collectively referred to as the CRUDEBU files):

a. The CRUDEBU and CRUDEBUWKLY files are copies of KII's crude oil database files. KII's crude oil database contains a table with run ticket information. The CT files are extracted from this database table. Plaintiffs' Exhibit 124, pp. 19–22. Thus, tapes containing CRUDEBU and CRUDEBUWKLY files contained information relevant to the subject matter of this litigation.

b. KII's crude oil database was backed-up to tape weekly and given CRUDEBUWKLY as a file name. The last CRUDEBUWKLY file created in a year was designated as a year-end tape and was designated for a longer retention period. These year-end tapes contained a snapshot of what was in the crude oil database as of the date of the last backup. Typically, the year-end CRUDEBUWKLY files would contain run ticket data for December and the first part of January.

c. The crude oil database contains a "lease master" table which is a complete list of all of the leases with which KII does business. For each lease, the file provides information such as the operator of the lease, the tank numbers of the tanks on the lease, and the type of lease. This database could be used to identify federal and Indian leases by writing a simple sorting program and using the MMS–2014's KII files with the government. The MMS–2014's reflect KII's identification number for each federal and Indian lease from which KII purchases and remits to the government. *See* Pretrial Stipulation ¶ 17. *See also* Plaintiffs' Exhibit 50.

d. Tape Lists (TLS–100's, etc.)

   i. Plaintiffs' Exhibit 57—this exhibit is a portion of a TLS–100 showing the tapes containing CRUDEBUWKLY files in KII's inventory on January 2, 1990. As of January 2, 1990, KII had tapes con-taining year-end CRUDEBUWKLY files for 1982–1987.

   ii. Plaintiffs' Exhibit 89—this exhibit is a portion of a TLS–100 showing the tapes containing CRUDEBUWKLY files in KII's inventory on June 21, 1995. As of June 21, 1995, KII had tapes containing year-end CRUDEBUWKLY files for 1986–1995.

   iii. Defendants' Exhibit AAAA—this exhibit is a portion of a TLS–100 showing the tapes containing CRUDEBUWKLY files in KII's inventory on April 24, 1996. As of April 24, 1996, KII had tapes containing year-end CRUDEBUWKLY tapes for 1986–1996.

e. Destruction of the CRUDEBUWKLY files:

   i. 1982–1984 Year–End Tapes—these tapes are no longer in KII's tape library. These tapes were routinely scratched by KII's tape librarian. However, the exact date of their destruction has not been established. The 1982 year-end tapes were scratched prior to 1991 and the 1983 and 1984 year-end tapes were scratched prior to 1994.

   ii. 1985–1987 Year–End Tapes

      (1) These tapes were scratched by Terri Tate, KII's Electronic Media Administrator, in April 1996. Defendants' Exhibits AAAA and BBBB. After talking with her supervisor, Ms. Tate scratched the tapes because she believed that they could no longer be read because the tapes were either bad or had parity errors. No specific actions were taken by KII to check the tapes to see if the tapes in fact had parity errors or, if there were parity errors, to see if the information on the tapes could be salvaged or recovered.

      (2) These tapes would have had run ticket data on them for December 1985, December 1986 and December 1987. The December 1987 run ticket data is, however, available to Plaintiffs from the tapes containing the

CT files that have been produced (i.e., the tape containing 1988 CT files has December 1987 data on it).

## D. RUN TICKETS

43. KII has provided Plaintiffs with approximately 95% of the actual federal and Indian run tickets for 1986 and 1987 where KII actually paid a royalty to the MMS. KII identified approximately 43,000 federal and Indian run tickets for 1986 and 1987, where KII paid the royalty to the MMS. KII was only able to locate and produce 41,000 of these 43,000 run tickets. Location and production of the 41,000 federal and Indian run tickets for 1986 and 1987 took more than 2,000 man-hours. KII was unable to identify and produce those federal and Indian run tickets for 1986 and 1987 where KII was not responsible for making the royalty payment to the MMS. The missing CT and CRUDE-BU files for 1986 and 1987 contained information for all run tickets, not just run tickets from certain federal and Indian leases.

44. KII has allowed Plaintiffs to inspect the actual run tickets for 1981–1985. However, five boxes of tickets for 1981, 24 boxes of tickets for 1982, one box of tickets for 1983, and seven boxes of tickets for 1984 are missing.

## E. TEXAS, OKLAHOMA AND NEW MEXICO DOCUMENTS

45. Run tickets, crude oil waybills/truck tickets, and driver daily reports contain information which is relevant to the subject matter of this litigation.

46. Breckenridge, Texas

a. Burning of documents occurred twice in Breckenridge, Texas—once in July 1983 and once in December 1984.

  i. Blank forms, including blank run tickets, were burned because Koch Oil of Texas changed names to Koch Services. The blank run tickets were burned rather than thrown in the trash because a blank run ticket is like a check—it entitles its holder to the payment of money for oil taken.

  ii. Carbon copies of run tickets, driver daily reports, dispatcher logs, crude oil waybills/truck tickets, and fuel tickets were burned. The originals had been sent to either a chief gauger or KII's home office in Wichita, Kansas. For example, when a run ticket is completed, five copies are made—one original and four carbon copies. One of the carbon copies was stored in Breckenridge, Texas. It was carbon copies like these that were being burned. The Breckenridge office was opened in October 1975. Documents from 1975 to 1978 were burned. The burning was ordered because there was no more filing space.

b. In February 1987 members of KII's senior management held a meeting at KII's division office in Breckenridge, Texas. Among others, Doyle Barnett, President of Koch Gathering; Darrell Brubaker, area superintendent; Gary Baker; David Nicastro and Danny Funderburg, district superintendent, attended the meeting. At the meeting, Mr. Barnett told the attendees that one reason the meeting had been called was to determine if the district and field offices had anything on paper describing the "Koch method" of measuring crude oil. Mr. Barnett and other senior management at the meeting wanted to ensure that there were no documents in the field stating how KII was purchasing crude oil. Management wanted the field employees to gather up all measurement-related documents and turn them over to their immediate supervisors. The documents were then to be forwarded to Wichita, Kansas. There was never a discussion or instruction at the meeting that the documents be destroyed.

  i. Stephen Marshall testified that he spoke with Mr. Nicastro after this meeting in the presence of an unidentified KII attorney and that Mr. Nicastro admitted that he had been out in the field and that he had told field personnel to get rid of their oil trucking documents. According to Mr. Marshall, the KII attorney was outraged and Mr. Nicastro's response was that it did not matter because it was done and over

with. Mr. Marshall also testified that he spoke with Mr. Funderburg at some point after the Breckenridge meeting and that Mr. Funderburg told him that Mr. Nicastro had told Mr. Funderburg to change the truck tickets filled out by the truck drivers to match the run tickets filled out by the gaugers.

(1) Mr. Nicastro categorically denies Mr. Marshall's allegations, stating that they are untrue, ridiculous and inconceivable.

(2) Plaintiffs offer no evidence from Mr. Funderburg which would corroborate Mr. Marshall's allegations.

(3) Mr. Marshall never reported any of these incidents to (a) Larry Moorman, a friend to whom Mr. Marshall often complained about Mr. Nicastro; (b) Mr. Cordes, Mr. Nicastro's superior; (c) Mr. Burgess, KII's corporate compliance officer and a former United States Attorney; or (d) any other member of management.

(4) Before discussing his allegations with Plaintiffs' lawyers, Mr. Marshall asked if he could be paid. Plaintiffs' lawyers declined to pay Mr. Marshall other than for his expenses.

(5) The Court is faced with Mr. Marshall's uncorroborated testimony and Mr. Nicastro's categorical denials. Given the facts, the Court finds that Plaintiffs have failed to carry their burden of establishing by a preponderance of the evidence that Mr. Nicastro told anyone to destroy oil trucking documents or that Mr. Funderburg altered truck tickets.

47. El Reno, Oklahoma

a. Carbon copies of run tickets, crude oil waybills/truck tickets, and driver daily reports were burned in 1989, 1990 and 1991. The originals had been sent either to a chief guager or to KII's home office in Wichita, Kansas. These copies were kept for three years in the El Reno office. Each year, the four-year-old documents were burned to make storage room for a new year's worth of documents. The burning usually occurred in

January. The copies were burned rather than thrown in the trash because the manager of the El Reno office felt that the documents contained confidential information, including information about how much his drivers were being paid.

48. Hobbs, New Mexico

a. Mr. Marshall testified that he spoke with Steve Calamare in Hobbs, New Mexico at some point after the Breckenridge, Texas meeting. According to Mr. Marshall, Mr. Calamare told Mr. Marshall that he had been told to change the truck tickets filled out by the truck drivers to match the run tickets filled out by the gaugers. Mr. Marshall testified that he actually observed Mr. Calamare making changes to the truck tickets. For the same reasons discussed in ¶ 46.b.i.(1), the Court finds Mr. Marshall's testimony not credible.

i. Plaintiffs offer no evidence from Mr. Calamare. There is, therefore, no evidence which would corroborate Mr. Marshall's allegations.

ii. Mr. Marshall never reported any of these incidents to any member of management.

iii. Before discussing his allegations with Plaintiffs' lawyers, Mr. Marshall asked if he could be paid. Plaintiffs' lawyers declined to pay Mr. Marshall other than for his expenses.

iv. Based on Mr. Marshall's uncorroborated testimony, the Court finds that Plaintiffs have failed to carry their burden of establishing by a preponderance of the evidence that Mr. Calamare altered truck tickets.

**F. MISCELLANEOUS**

49. Norman Vandiver shredded unspecified security department investigation files in 1984 and about six times on other occasions.

50. On June 24, 1985, David Nicastro, who was in charge of the KII Security Department, sent a memo to all Department Managers and Supervisors. The memo advised that KII had purchased a high-speed shredder and that the security department would be responsible for operating the shred-

der. *See* Plaintiffs' Exhibit 18 and Defendants' Exhibit U.

a. The shredder was located in a central area near the employee cafeteria.

b. The shredder was operated only by security officers who would pick up documents left at designated places and shred them nightly.

c. Mr. Nicastro's June 24, 1985 memo contains no instructions on what to or not to shred. It merely describes the location of the shredder and the procedure for using the shredder. Whatever was placed in a bin outside the room containing the shredder was routinely shredded by KII security officers.

d. At some point after 1987, the volume of documents being shredded by KII increased and KII began to have documents shredded by an outside company.

e. The security department did not log or inventory the documents shredded in the shredder.

f. KII prints approximately 50,000 checks a month. Each month, KII also prints a large number of computer-generated reports containing sensitive information. The bulk of the documents shredded by KII consisted of checks and other computer-generated reports.

g. Stephen Marshall alleges that at some point in 1989 he saw Mr. Nicastro in the shredding room, with the shredder running and wearing ear protection. Mr. Marshall testified that he saw at least two "transfer cases" containing documents in the shredding room with Mr. Nicastro. The obvious inference Plaintiffs wish the Court to draw from this testimony is that Mr. Nicastro was shredding documents. There is, however, absolutely no evidence of what it is that Mr. Nicastro was supposed to have been shredding, let alone evidence that he was shredding anything of value to this case.

51. As of late 1992, Mrs. Sanborn was serving as KII's manager of corporate records. As manager of corporate records, Mrs. Sanborn was responsible for the off-site storage of documents at Underground Vault and Storage ("UV & S"), a private storage company. On December 12, 1994, Mrs. Sanborn ordered UV & S to destroy 2,399 boxes of KII documents. The boxes that were destroyed spanned from the 1960's to 1980. *See* Exhibit 11 to Mrs. Sanborn's April 23, 1998 deposition.

a. The December 1994 destruction of documents at UV & S was the one and only time that documents at that facility had been destroyed.

b. The idea for Mrs. Sanborn to destroy documents at UV & S was initiated in a staff meeting with Mrs. Sanborn's supervisor. The purpose for destroying the UV & S documents was to reduce KII's cost of off-site storage. Sometime after this meeting, Mrs. Sanborn requested UV & S to send her copies of the location control sheets for all KII documents at UV & S. Mrs. Sanborn reviewed the oldest files on the location control sheets and highlighted the ones she felt could be destroyed. Mrs. Sanborn then put the sheets in order by department and sent the highlighted sheets to each department to obtain their approval to destroy the highlighted documents.

c. Mrs. Sanborn would not order anything destroyed without written permission from a management-level official in the department who had created the documents to be destroyed. Mrs. Sanborn had also recommended in the past that each department consult with KII's legal and tax departments before approving a destruction request. Mrs. Sanborn has no way of knowing, however, whether the highlighted forms she sent out were ever reviewed or approved by anyone in KII's legal or tax departments.

d. Of the 2,399 boxes destroyed, approximately 1,370 of them were old accounting records, consisting of canceled checks, invoices, general ledgers, etc. Approximately 195 boxes contained canceled payroll checks. Most of the remaining boxes belonged to KII departments and companies having no real connection or involvement with the oil and gas measurement issues involved in this litigation. However, approximately 241 of the

boxes destroyed were records from Koch Oil.

## CONCLUSIONS

52. Federal judges are cloaked with the inherent power to impose evidentiary and monetary sanctions as a means of controlling and supervising the litigation before them so as to achieve an orderly and expeditious disposition of the litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quotation omitted); *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1419 (10th Cir.1997). *See also* Fed.R.Civ.P. 37.

53. Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim. *See, e.g., Talmadge v. State Farm Mutual Automobile Ins. Co.*, 107 F.3d 21, 1997 WL 73476, at *3 (10th Cir.1997).

54. A litigant has a duty to preserve evidence that it knows or should know is relevant to imminent or ongoing litigation. KII should have reasonably anticipated litigation regarding its measurement practices at some point in time between October 1986 (the date of William Koch's deposition in the *Martin Oil* case) and February 1988 (the date the RICO amendment in the *Oxbow* case was filed).

55. The Court finds that Plaintiffs have failed to establish that KII, through its employees, engaged in conduct intended to thwart discovery of relevant evidence through the purposeful destruction of evidence. Nevertheless, KII's uncoordinated approach to document retention, especially documents potentially relevant to litigation, denied Plaintiffs potential evidence to establish the facts in dispute in this case.

56. Missing Evidence

a. Northern Division Documents—Plaintiffs have failed to carry their burden of proof to establish that specific documents relevant to this litigation, containing information which is otherwise unavailable, were destroyed in KII's Northern Division.

b. Computer Tapes

i. AH Files for August 1980 to August 1983 were destroyed by KII at a time when they should have been preserved as potentially relevant evidence in imminent or ongoing litigation. *See* ¶ 40.d, *supra*, for a description of how and when these tapes were destroyed.

(1) The Court chooses 1980 as the starting date because tapes containing AH files were generally maintained by KII for seven years when KII's duty to preserve evidence relevant to its measurement practices arose in 1987. Thus, in 1987, KII should have had tapes containing AH files dating back to 1980.

(2) The Court chooses 1983 as the ending date because KII did not create any tapes containing AH files after August 1983.

ii. CT Files for August 1986 to December 1987 were destroyed by KII at a time when the files should have been preserved as potentially relevant evidence in imminent or ongoing litigation. *See* ¶¶ 41.d and 41.e, *supra*, for a description of how and when these tapes were destroyed.

(1) The Court chooses 1986 as the starting date because tapes containing CT files were generally maintained by KII for one year when KII's duty to preserve evidence relevant to its measurement practices arose in 1987. Thus, in 1987, KII should have had tapes containing CT files back to 1986.

(2) The Court chooses 1987 as the ending date because CT files for dates after 1987 have been produced to Plaintiffs.

(3) Plaintiffs have failed to carry their burden of proving that the CT1TICKETSBU files for January 1986 to November 1987 were recklessly lost or destroyed or intentionally lost or destroyed to prevent their discovery and ultimate production as evidence in this lawsuit.

iii. CRUDEBUWKLY weekly and year-end files for 1982 to 1987 were de-

stroyed by KII at a time when the files should have been preserved as potentially relevant evidence in imminent or ongoing litigation. *See* ¶ 42.e, *supra,* for a description of how and when these tapes were destroyed.

(1) KII began maintaining CRUDE-BUWKLY files in 1982. The Court chooses 1982 as the starting date because tapes containing CRUDE-BUWKLY files were generally maintained by KII for seven years when KII's duty to preserve evidence relevant to its measurement practices arose in 1987. Thus, in 1987, KII should have had tapes containing CRUDEBUWKLY files dating back to 1982.

(2) The Court chooses 1987 as the ending date because CRUDEBUWKLY files after that date are available to Plaintiffs.

(3) Plaintiffs have failed to carry their burden of proving that the CRUDE-BUWKLY year-end files for 1986–1987 were recklessly lost or destroyed or intentionally destroyed to prevent their discovery and ultimate production as evidence in this lawsuit.

c. Run Tickets—with their current motion, Plaintiffs have not attempted to seek any relief for missing federal and Indian run tickets. There is also no evidence currently before the Court as to when and under what circumstances the 38 boxes of missing federal and Indian run tickets were lost or destroyed.

d. Texas, Oklahoma and New Mexico Documents—Plaintiffs have failed to carry their burden of proof to establish that specific documents relevant to this litigation, containing information which is otherwise unavailable, were destroyed by KII employees in Texas, Oklahoma and New Mexico. Also, the Breckenridge, Texas burnings occurred prior to the time KII should reasonably have anticipated measurement litigation.

e. Miscellaneous

i. Norman Vandiver—Plaintiffs have failed to carry their burden of proof to establish that Norman Vandiver destroyed any security department investigation files relevant to this litigation. Also, Mr. Vandiver destroyed files prior to the time KII should reasonably have anticipated measurement litigation.

ii. David Nicastro—Plaintiffs have failed to carry their burden of proof to establish that David Nicastro destroyed or shredded any documents relevant to this litigation.

iii. Sarah Seeley–Sanborn—with their current motion, Plaintiffs have not attempted to seek any relief for missing boxes of documents stored at UV & S. *See* July 7, 1998 Order, Doc. No. 315. There is also no evidence currently before the Court regarding what was in fact destroyed and its relevance, if any, to measurement-related issues.

57. Sanctions for the destruction of evidence serve three distinct remedial purposes: punishment, accuracy, and compensation. Sanctions which serve to punish a spoliator advance the goals of retribution, specific deterrence, and general deterrence. Some sanctions are designed to promote accurate fact finding by the court or jury. Other sanctions attempt to compensate the non-spoliating party by redressing the imbalance caused by the spoliator's destruction of relevant evidence. A court should select the least onerous sanction necessary to serve these remedial purposes. The severity of the sanction selected should be a function of and correspond to the willfulness of the spoliator's destructive act and the prejudice suffered by the non-spoliating party. Gorelick, Marzen and Solum, *Destruction of Evidence* § 1.11–1.13, 1.21 & 3.16 (1989 & 1997 Cum. Supp.) (citing many cases). Thus, courts consider a variety of factors in determining an appropriate sanction, but the following two factors carry the most weight: the degree of culpability of the party who lost or destroyed the evidence, and the degree of actual prejudice to the other party.

58. KII's Culpability Regrading the Loss of The Computer Tapes—the negligence of

KII's senior management resulted in the destruction of computer files containing information relevant to the issues in this litigation at a time when KII had a duty to preserve those files as potentially relevant to imminent or ongoing litigation. The Court's following discussion is directed primarily at KII's failure to adequately advise its computer department employees regarding imminent and ongoing litigation.

a. The obligation to preserve evidence that is potentially relevant to imminent or ongoing litigation is an affirmative duty that rests squarely on the shoulders of senior corporate officers.

b. When senior management fails to establish and distribute a comprehensive document retention policy, which has been communicated to and which is accessible to its employees, management cannot shield a corporation from responsibility because an employee routinely destroyed information relevant to imminent or ongoing litigation.

i. KII had no formal document retention policy and no formal policy or procedure for notifying its employees of imminent or pending litigation and the concomitant need for those employees to preserve evidence related to imminent or ongoing litigation. In fact, Mr. Cordes, the person responsible for preserving litigation-related information at all relevant times, never discussed the need for such a policy with KII's CEO.

ii. KII's Standards of Corporate Conduct are not document retention policies and they do not provide guidance on preservation of evidence related to imminent or ongoing litigation.

iii. When KII became aware or should have become aware that measurement-related litigation was imminent, KII should have also been aware that certain computer files would be potentially relevant. KII should have taken affirmative steps at that time to control and prevent the destruction of potentially relevant computer files stored in KII's main computer tape library. As the various measurement-related investigations progressed, it should have become very clear to KII that information stored on the computer tapes in KII's tape library would be relevant.

iv. There is no evidence that KII, at any time before the spoliation allegations surfaced in this case, made an effort to determine what type of information was maintained in the tape library and whether any of that information might be potentially relevant to imminent or ongoing measurement-related litigation.

v. Prior to May 1996, neither KII's data processing managers nor KII's tape librarian had been given specific instructions regarding what information should or should not be preserved in connection with imminent or ongoing litigation. The tape librarian and data processing personnel continued to scratch tapes throughout the 1980's and 1990's, apparently oblivious to the fact that KII had several pieces of measurement-related litigation pending. The same can be said for KII's Manager of Corporate records, Mrs. Sanborn. She also was not generally informed about pending litigation.

vi. Mr. Hanna's July 11, 1988 memo itself does not advocate the destruction of evidence known to be relevant to imminent or ongoing litigation. Nevertheless, Mr. Hanna's memo, coupled with the lack of clear guidelines from KII management regarding the destruction of information in the tape library and KII's lack of a clearly established mechanism for notifying computer employees of imminent and ongoing litigation, created the opportunity for the careless destruction of tapes in the tape library containing information relevant to imminent and ongoing litigation.

vii. Mr. Cordes' November 16, 1988 memo did not and was not intended to reach KII's data processing center or accounting groups.

viii. There is no evidence that any information in Mr. Cordes' early 1990

memo, in which he disseminated the Document and Computer Data Preservation Order in the *Expanding Energy* case to approximately 20 individuals, was ever communicated to the computer tape librarian or the manager of the data processing center. Mr. Cordes may have been attempting to use a trickle-down approach by notifying senior managers and then letting the information trickle down to front-line employees, like the tape librarian. It appears, however, that the stream was dammed by some unknown obstruction because the information never trickled down to the tape-librarian or the manager of the data processing center.

ix. Mr. Wiley's and Mr. White's September 1994 emails, extending the retention period for CT and year-end CRUDEBUWKLY files, are not sufficient to discharge KII's duty to ensure that computer tapes with information relevant to imminent and ongoing litigation are preserved.

(1) Mr. Wiley's and Mr. White's emails to the computer tape librarian could not have prevented the destruction of the AH files. The emails did not apply to AH files and they were written after the AH files had already been destroyed.

(2) Many computer tapes with information relevant to this litigation were destroyed prior to September 1994. Obviously Mr. Wiley's and Mr. White's emails could have done anything to prevent the destruction of computer tapes destroyed prior to September 1994.

(3) Neither Mr. Wiley's email nor Mr. White's email notified the tape librarian that the retention periods were being extended because of this or any other litigation. The librarian was never told to take special care to see that tapes containing these files were not destroyed because they contained information relevant to litigation in which KII was involved. The librarian was never told that severe consequences might result if tapes with files containing information relevant to litigation were lost or destroyed. In other words, the librarian was not aware that these tapes were any more or less important than any of the other thousands of tapes in the library.

(4) Mr. Wiley's and Mr. White's emails were not motivated by management's desire to preserve certain tapes because they might be requested and produced to an opposing party in litigation. Rather, the emails were generated because Vance Klager and others were attempting to rerun KII's ACT504 process in connection with this litigation.

(5) The only tapes destroyed after September 1994 were (a) the tapes containing the 1986–1987 CT1TICKETSBU files lost during the April 1995 conversion, (b) the 1985–1987 CRUDEBUWKLY year-end files destroyed by Terri Tate in April 1996, and (c) the October 1987 to April 1988 CT1TICKETS files that were routinely scratched by the tape librarian from October 1994 to April 1995.

(a) While the Court finds that the 1986–1987 CT1TICKETSBU files and the 1985–1987 CRUDEBUWKLY year-end files were not destroyed with the intent to prevent their discovery and use in litigation, the Court does find that their loss was proximately caused by senior management's negligence. Had senior management adequately performed its duty to identify tapes in the tape library containing information relevant to imminent or pending litigation and had senior management educated the tape librarian and data center personnel about pending litigation and the need to preserve ceratin tapes in connection with pending litigation, it is reasonable to infer

that the tape librarian and data center personnel would have taken more care with the tapes that were ultimately lost or destroyed. In other words, the tape librarian and data center personnel would not have treated the litigation-related tapes the same way they treated the other thousands of tapes in the tape library.

(6) Neither Mr. Purtell's May 1, 1996 email nor Mr. Cordes' May 9, 1996 memo would have been effective to stop the destruction of the relevant AH, CT and CRUDEBUWKLY files because they had all been destroyed by April 1996. KII's senior management should have taken action sooner to insure that tapes in the tape library containing files with potentially relevant information were not destroyed.

x. The Court finds that KII's senior management was negligent in failing to determine which tapes in the tape library contained information relevant to imminent and ongoing litigation and in failing to communicate clear guidelines regarding the preservation of information related to imminent and ongoing litigation to KII's data processing personnel and computer tape librarian. The negligence of KII's senior management created an environment that led to the destruction by computer personnel of computer tapes that should have been preserved as evidence potentially relevant to imminent or ongoing litigation.

c. The Tenth Circuit recently considered "the evidentiary doctrine" of spoliation of evidence in *Aramburu v. Boeing Co.*, 112 F.3d 1398 (10th Cir.1997). The Tenth Circuit held in *Aramburu* that as a general rule, the "bad faith destruction of [evidence] relevant to proof of an issue at trial gives rise to an inference that production of the [evidence] would have been unfavorable to the party responsible for its destruction." *Id.* at 1407. The Court also held that because only the bad faith loss or destruction of evidence will "support an inference of consciousness of a weak case," no adverse inference should arise from spoliation that is merely negligent. *Id.* See also *Jordan F. Miller Corp. v. Mid–Continent Aircraft Service, Inc.*, 139 F.3d 912, 1998 WL 68879, at * 4 (10th Cir.1998); and *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir.1997). Courts have not, however, imposed a similar requirement of bad faith when considering other sanctions for the spoliation of evidence.

i. KII's negligence resulted in the destruction of computer files containing information relevant to the issues in this litigation at a time when KII had a duty to preserve those files as potentially relevant to imminent or ongoing litigation. Plaintiffs have failed to carry their burden of proof to establish by a preponderance of the evidence that KII destroyed the computer files intentionally or with bad faith. Therefore, no "adverse inference" jury instruction should arise from KII's destruction of the computer tapes. Plaintiffs are, however, not precluded from informing the jury as to which relevant computer tapes were destroyed and the impact that the destruction has had on Plaintiffs' proof. The jury will simply have to draw its own inferences without a specific "adverse inference" instruction from the Court.

59. Prejudice to Plaintiffs Regarding the Loss of the Computer Tapes

a. Using run ticket information, Plaintiffs are able to perform the types of statistical analyses represented by Plaintiffs' exhibits 37–41. These types of analyses would be helpful to Plaintiffs to prove their allegation that KII's gaugers recorded false measurements on run tickets. The Information in the AH, CT and CRUDEBUWKLY files is much more capable of being easily manipulated to perform these analyses than is the exact same data on the actual run tickets.

i. There is no other evidence in the record establishing how Plaintiffs intend to use the missing tapes other than to

preform the statistical analyses discussed above.

b. For Plaintiffs' statistical analyses to be meaningful, Plaintiffs need run ticket information from all leases for a given time, not just federal and Indian leases. A statistical analysis of a gauger's patterns could not be made from just his run tickets on federal and Indian leases. For example, a gauger may only run a load of oil from a federal lease once a month, but run seven leases a day. A meaningful analyses could be conducted on that gauger's 1,800+ total pickups for the year, but not on just his 12 federal pickups for the year.

c. The data on the missing tapes cannot be entirely recreated.

   i. It is cost and time prohibitive to recreate the missing computer files, or a subset of these files, by keypunching the data from existing run tickets.

   ii. Thirty eight boxes of federal and Indian run tickets for 1981–1984 are missing. KII also cannot identify and produce those federal and Indian run tickets for 1986 and 1987 where KII was not responsible for making the royalty payment to the MMS.

   iii. Information from several million run tickets would have to be keypunched to recreate the missing tapes.

d. One of Plaintiffs' central theories in this case is that KII dramatically curtailed its alleged mismeasurement practices in 1988 as a result of growing pressure from investigations being conducted by the FBI, the United States Senate and William I. Koch. Plaintiffs allege that KII's most egregious mismeasurement activities occurred prior to 1988. All of the missing computer tapes contained pre–1988 information. Plaintiffs have, therefore, been deprived of the opportunity to analyze KII's purchasing practices at precisely the point in time when Plaintiffs allege that KII's behavior was the most egregious.

e. KII argues that the statistical analyses Plaintiffs wish to perform are not that valuable because KII would be able to effectively poke holes in the analysis used by Plaintiffs' statistician. While KII may be correct about its ability to shred Plaintiffs' statistical analyses on cross-examination, Plaintiff should have had the opportunity to conduct the statistical analyses discussed above.

f. The Court ultimately finds that the statistical analyses Plaintiffs would have performed with the missing tapes would have been useful and probative in helping Plaintiffs prove their allegation that KII's gaugers recorded false measurements on run tickets. Plaintiffs' inability to perform the statistical analyses discussed above does not, however, completely prevent Plaintiffs from proving their allegations.

The Court has made findings and conclusions regarding what evidence has been spoliated, the culpability with which it was spoliated, the importance of that evidence to Plaintiffs and the resulting prejudice to Plaintiffs of KII's spoliation. The Court has, however, refrained from making a conclusion regarding the type of sanction to be imposed because of KII's spoliation. At the closing argument hearing held on April 1, 1998, Plaintiffs also did not address the type of sanction that should be imposed. Rather, Plaintiffs preferred, and the Court agreed, to defer argument on a specific sanction until after the Court had made findings and conclusions regarding what was spoliated and the degree of prejudice suffered by Plaintiff. By August 28, 1998, Plaintiffs shall file a brief addressing what sanction they believe is appropriate in light of the Court's findings and conclusions in this Order. Defendants shall respond by September 15, 1998.

IT IS SO ORDERED.